FILED

2009 Mar-30  AM 10:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JACK W. ECHOLS, JR, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **CASE NO. CV 08-B-219-S** |
| | } | |
| CONROS CORPORATION; NAVIN | } | |
| CHANDARIA, | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is a diversity action alleging a breach of contract as well as various

fraud-related tort claims arising out of an employment contract between an Alabama

citizen and a Canadian corporation, and it is currently before the court on defendant

Navin Chandaria's ("Chandaria") Motion to Dismiss for Lack of Personal Jurisdiction,

(doc. 5).[1]  At oral argument, counsel for plaintiff Jack W. Echols, Jr.'s ("Echols")

conceded that any breach of contract claim against Chandaria that might have been

asserted in Echols's Complaint was due to be dismissed; thus, Echols brings only his four

tort claims — for fraud, promissory fraud, suppression, and deceit[2] — against Chandaria

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

[2] Based on the plaintiff's allegations and the elements of these different causes of action
under Alabama law, the court assumes, without deciding the sufficiency of the Complaint, that
the plaintiff is alleging the causes of action of *fraudulent* misrepresentation, promissory fraud,
*fraudulent* suppression, and *fraudulent* deceit, and thus is alleging four fraud-related tort claims
in addition to his breach of contract claim.  *See* Ala. Code §§ 6-5-101 (fraudulent

individually.  Chandaria has preserved his personal jurisdiction defense by filing a notice of special appearance, (doc. 3), before his time to answer Echols's Complaint had expired, which notified the court that the parties had agreed to an extension of time for the defendants to respond or contest jurisdiction pursuant to Rule 12 of the Federal Rules of Civil Procedure ("the Federal Rules").  (Doc. 3 at 2); *see* Fed. R. Civ. P. 12(a)(1)(A)(I) (mandating a 20-day time limit to answer after service with summons and complaint, absent a waiver of service), 12(h)(1) (providing that a party who fails to raise the defense of a lack of personal jurisdiction either by making a motion under Rule 12(b)(2) or including the defense in a responsive pleading or amendment waives the defense).  Chandaria did indeed file his motion to dismiss contesting personal jurisdiction by the parties' agreed-upon deadline.  (Doc. 5.)

Along with their briefs, the parties have submitted the following evidence: an affidavit by Chandaria, an affidavit by Echols, and the two key agreements entered into by Chandaria and Echols.[3]  (Doc. 5-2, Ex. A, Ex. 1, Ex. 2; Doc. 7-2, Ex. 1.)  Based on the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that Chandaria's motion to dismiss is due to be granted and that all of Echols's claims against Chandaria are due to be dismissed.

_____

misrepresentation), 6-5-102 (fraudulent suppression); 6-5-104 (fraudulent deceit); *Bethel v. Thorn*, 757 So. 2d 1154, 1159 (Ala. 1999) (promissory fraud).

[3] Although it does not affect the court's opinion, the court notes that its copy of the parties' two-page, handwritten agreement, dated May 13, 1999, appears to be missing text at the bottom of each page.  (Doc. 5-2, Ex. 2, 1999 Agreement.)

## I. STANDARD ON MOTION TO DISMISS
## FOR LACK OF PERSONAL JURISDICTION

A motion to dismiss for lack of personal jurisdiction must be denied if "the plaintiff alleges sufficient facts to support a reasonable inference that defendant can be subjected to jurisdiction of the court." *See Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1579 (11th Cir. 1986). The court may, at its discretion, hold an evidentiary hearing. *See Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990); *Delong Equipment Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988), *cert. denied*, 494 U.S. 1081 (1990). When no evidentiary hearing is held, the following standard is applied:

> [T]he plaintiff must establish a prima facie case of personal jurisdiction over a nonresident defendant. A prima facie case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict. The district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. Finally, where the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff.

*See Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 255 (11th Cir. 1996) (quoting *Madara*, 916 F.2d at 1514 (citations omitted)).

To exercise personal jurisdiction over a nonresident defendant, the court must first consider the reach of the forum state's long-arm statute, and, if there is a basis for jurisdiction under the long-arm statute, determine whether "sufficient minimum contacts

3

exist to satisfy the Due Process Clause of the Fourteenth Amendment so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *See Madara*, 916 F.2d at 1514 (quoting *Int'l Shoe Co v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted).  In Alabama, the long-arm statute, Ala. R. Civ. P. 4.2(b), authorizes the exercise of personal jurisdiction to the limits of the U.S. Constitution, so there is no distinction between these two steps when evaluating a challenge to personal jurisdiction in a suit brought in Alabama.  *See South Ala. Pigs, LLC v. Farmer Feeders, Inc.*, 305 F. Supp. 2d 1252, 1257 (M.D. Ala. 2004); *Butler v. Beer Across Am.*, 83 F. Supp. 2d 1261, 1266 (N.D. Ala. 2000).  That said, "whether the assertion of personal jurisdiction over a nonresident comports with due process is itself a two-prong inquiry." *Madara*, 916 F.2d at 1515–1516.  As thoroughly analyzed by the Eleventh Circuit in *Madara*,[4] the "minimum contacts" step is satisfied when the defendant has "'fair warning' that a particular activity may subject him to the jurisdiction of a foreign sovereign," and his conduct is such that "he should reasonably anticipate being haled into court there."  *See id.* at 1516.  Once it has been established that the defendant had sufficient minimum contacts, in appropriate cases, "these contacts *may* be considered

---

[4] In a footnote, the *Madara* court explained that it was only presented with a question of *specific* personal jurisdiction, and not *general* personal jurisdiction, concepts discussed in further detail below, because the plaintiff in that case had not demonstrated that defendant challenging jurisdiction had such "continuous and systematic" contacts with the forum state to warrant the exercise of general personal jurisdiction.  *See Madara*, 916 F.2d at 1516 n. 7.  Thus, as in the instant case, where the plaintiff has declined to present an argument for general personal jurisdiction, (doc. 7 at 3), the standards set forth in *Madara* precisely apply.

in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *See Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985) (emphasis added); *Madara*, 916 F.2d at 1517 (citing *Burger King* but changing the "may" to "are").  Those factors are "the burden on the defendant in defending the lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of states in furthering fundamental substantive social policies."  *Madara*, 916 F.2d at 1517; *see also World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 292 (1980).  As noted by the Supreme Court, "these considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."  *See Burger King*, 471 U.S. at 477.

"General" and "specific" personal jurisdiction refer to the different ways in which a court can exercise personal jurisdiction, depending on whether the suit must arise out of or relate to the defendant's contacts with the forum.  General personal jurisdiction does *not* depend on the suit arising out of the defendant's contacts with the forum state, and it comports with due process as long as the defendant's contacts are "continuous and systematic."  *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9, 415 (1984); *Williams Elec. Co. v. Honeywell*, 854 F.2d 389, 392 n.2 (11th Cir. 1988) (per curiam).  Specific personal jurisdiction, on the other hand, does require that the

plaintiff's claims arise out of or relate to the defendant's contacts with the forum. *See Helicopteros*, 466 U.S. at 414 n.8; *Honeywell*, 854 F.2d at 392.

## II. FACTUAL SUMMARY[5]

Chandaria is a Canadian citizen and resident who, in his capacity as the President and Chief Executive Officer ("CEO") of co-defendant Conros Corporation ("Conros"), visited Alabama on multiple occasions[6] in 1993 and 1994 to recruit Echols, a U.S. citizen and resident of Jefferson County, Alabama,[7] for employment with Conros. (Doc. 1, Complaint, at ¶¶ 2, 4, 12–16; Doc. 7-2, Ex. 1, Echols Aff., at ¶¶ 7–9.) On February 16, 1994, Echols entered into an employment contract with Conros ("the 1994 agreement"), which was signed by Chandaria on Conros's behalf. (Doc. 1 at ¶ 21; Doc. 5-2, Ex. A,

---

[5] As required when evaluating a motion to dismiss for lack of personal jurisdiction, the court has accepted all undisputed facts alleged in the Complaint as true and has construed all disputed facts in the light most favorable to Echols, the plaintiff.

[6] In his affidavit, Chandaria denies that he has "regularly visited the state of Alabama." (*Id.* at ¶ 14.) He also does not directly admit visiting Alabama in 1993 and 1994 to engage in employment negotiations with Echols, and instead states that the only times he has visited Alabama are for purposes unrelated to Echols's present claims. The court is uncertain whether Chandaria denies visiting Alabama for any reason related to Echols's claims simply because Chandaria maintains that Echols's claims against him personally only involve events that took place in 1999 in Canada, and therefore does not consider any visits that he might have made to Alabama in 1993 and 1994 as "hav[ing] to do with Mr. Echols's claims against [him] personally." (Doc. 5 at 4; Doc. 5-2, Ex. A, Chandaria Aff., at ¶ 14.) Chandaria does admit, however, that he first met Echols on one of his visits to Alabama around 1992. (*Id.*)

[7] Although Echols alleges in his Complaint that he has been a resident of Jefferson County, Alabama, "at all times material to the events referenced herein," (doc. 1, Complaint, at ¶ 4), his affidavit only uses the present tense to confirm that he is currently a resident of Alabama. Chandaria does not specifically deny that Echols has remained a resident of Alabama, but he does assert that Echols relocated to Toronto, Canada, when he began working for Conros in 1994. (Doc. 5-2, Ex. A, at ¶ 4.)

Chandaria Aff., at ¶ 3.)  Chandaria sent the 1994 agreement to Echols by fax, and Echols returned a signed copy by fax.  (Doc. 7-2, Ex. 1, at ¶ 6.)

The 1994 agreement provided Echols with a renewable three-year term of employment with Conros, to begin on May 1, 1994, as Conros's Vice President of Sales. (Doc. 5-2, Ex. 1, 1994 Agreement, at ¶ A; Doc. 1 at ¶ 5.)  In this position, Echols was expected to be responsible for all firelog sales to food retail outlets.  (Doc. 5-2, Ex.1, at ¶ F.)  As compensation, the agreement provided Echols with a base salary of $150,000 per year plus "2% of Conros's sales to Walmart and Sams."  (Doc. 5-2, Ex. 1, at ¶ B.)  The agreement also anticipated that Echols and his family would relocate to Toronto, Canada. (Doc. 5-2, Ex. 1, at ¶¶ E, unlabeled paragraph.)

On October 6, 1995, Conros and Chandaria gave Echols a "one time special bonus" of $20,000, representing a "token of appreciation" due to the absence of sales to Wal-Mart and Sam's Club in the first year of Echols's employment.  (Doc. 1 at ¶ 26.)  In October or November of 1998, Echols told Dhiren Chandaria[8] and defendant Navin Chandaria that he wanted to defer his annual 2% sales commission until his retirement from Conros.  (*Id.* at ¶ 30.)  Conros and Chandaria (Echols does not specify whether he

---

[8] To the court's knowledge, the only time that Dhiren Chandaria is mentioned in the record is in one paragraph of Echols's Complaint.  (Doc. 1 at ¶ 30).  Neither party explained in the briefs the relationship between Dhiren Chandaria and Echols, so when the court inquired about it at oral argument, Chandaria's counsel informed the court that Dhiren Chandaria is another of Conros's officers.

refers to Navin or Dhiren Chandaria) agreed to this request as a course of dealing.  (*Id.* at ¶ 32.)

In 1999, Conros acquired Pine Mountain Corporation ("Pine Mountain"), thereby inheriting former Pine Mountain employees who performed duties similar to those performed by Echols.  (Doc. 5-2, Ex. A, at ¶ 5.)  On May 13, 1999, Chandaria hand-wrote and signed a two-page agreement ("the 1999 Agreement"), which was initialed by Echols, that reflected different employment obligations than those set forth in the 1994 agreement.[9]  (Doc. 1 at ¶¶ 28–29; Doc. 5-2, Ex. A, at ¶ 7; Doc. 5-2, Ex. 2, 1999 Agreement.)  In particular, the 1999 agreement established a new base salary of $200,000, plus a commission that apparently would be based on whether Conros met certain sales targets.  (Doc. 5-2, Ex. 2, at ¶¶ 1, 2.)  Additionally, the 1999 agreement provided Echols with a life insurance policy.  (*Id.* at ¶¶ 3, 4.)  While the 1999 agreement contained the statement, "Details to be finalized," (*id.* at 2), the court is unaware of any subsequent writing.

---

[9] Echols alleges that the 1999 agreement was only a partial modification of the 1994 agreement and that the provisions of the 1994 agreement continued in full force until Echols eventually left Conros's employment in 2006.  (Doc. 1 at ¶¶ 28–29).  Chandaria presents a significantly different version of the facts.  According to Chandaria's affidavit, around the time of the Pine Mountain acquisition, Echols met with Chandaria in Conros's Toronto office and resigned from Conros; the next day, however, Echols returned and asked to be rehired, so Echols and Chandaria executed the 1999 agreement in the Toronto office as an entirely new employment agreement.  (Doc. 5-2, Ex. A, at ¶¶ 6–8.)  Echols denies that he ever resigned, (doc. 7-2, Ex. 1, at ¶ 5), but he does not specifically deny that the 1999 agreement, in whatever way it should legally be characterized, was negotiated and executed in Canada.

In September 2006, Conros sold its firelog division to Jarden Corporation ("Jarden") and agreed as part of the sale that Echols would work for Jarden. (Doc. 1 at ¶¶ 33–34.) Echols therefore became and is still employed by Jarden as its Vice President of Sales for its firelog division. (*Id.* at ¶ 36.) At the time of the sale to Jarden, Chandaria gave Echols repeated assurances that there was something in the deal for Echols and that Echols would be "taken care of under his contract."[10] (*Id.* at ¶¶ 35, 38.)

According to Echols, Conros and Chandaria have not fulfilled their obligations to compensate him per the terms of his employment contract. (*Id.* at ¶¶ 37, 39.) As a result, Echols has brought this suit alleging a breach of his employment contract as well as fraud-related tort claims. The only clearly articulated allegations underlying Echols's fraud claims are contained within his fraudulent misrepresentation claim and are incorporated by reference into the remaining claims: Chandaria executed the 1999 agreement with the subjective belief that it would be a novation,[11] and therefore

---

[10] Echols does not identify whether the contract about which he was allegedly given assurances was the 1994 or 1999 agreement. As the basis for his fraudulent misrepresentation claim, however, Echols asserts that the intent of Chandaria's misrepresentations was to deprive Echols of his 2% sales commission, a provision that was included in the 1994 agreement but that was not included in the 1999 agreement, so any fraudulent assurances about the payment of the commission would appear to relate to the 1999 agreement, not the 1994 agreement. (Doc. 1 at ¶ 47; Doc. 5-2, Ex. 1, at ¶ B.)

[11] Even if Echols did resign and enter into the 1999 agreement with Conros in satisfaction of any existing duties under the 1994 agreement, that contract would be simply a "substituted contract" and not a "novation," because the parties to the original contract did not change. *Compare* REST. (SECOND) OF CONTRACTS § 279 (substituted contract) *with* § 280 (novation); *see* WILLISTON ON CONTRACTS § 73:36 (explaining that a novation is a variety of substituted contract and that "[t]he critical distinction between a novation and other substituted contracts is the inclusion of at least one new party in the transaction, one who was neither the obligor nor the

Chandaria had an intent to deprive Echols of the 2% sales commission provided in the 1994 agreement.  (Doc. 1 at ¶¶ 41–62.)

As additional evidence of Chandaria's contacts with Alabama, Echols attests that besides Chandaria's 1993 and 1994 visits to recruit Echols for employment, Chandaria visited Alabama for business at other times and even visited Alabama on occasions after the 1994 agreement was executed in connection with Echols's duties and employment with Conros.  (Doc. 7-2, Ex. 1, at ¶¶ 10, 12–14.)  Furthermore, Echols maintains that Chandaria has arranged for the purchase of real estate in Alabama, but Echols does not specify whether that transaction involved Chandaria in his individual or corporate capacity.  (*Id*. at ¶ 14.)[12]

## III. DISCUSSION

At the outset, the court notes that there are several factual disputes between Echols and Chandaria about which the court renders no final decision at this time.  Those disputes include (1) whether and how often Chandaria visited Alabama, especially in relation to Echols's employment with Conros; (2) whether Echols was indeed an Alabama resident at all times encompassed by his Complaint; and (3) whether Echols resigned from Conros in 1999 and effectively terminated the 1994 agreement, and then later

---

obligee under the original contract").

[12] Chandaria denies that he has ever lived, worked, or owned or leased property in Alabama and maintains that he has never transacted business in the state in his individual capacity.  (Doc. 5-2, Ex. A, at ¶¶ 10, 13.)

executed the 1999 agreement, or whether Echols never resigned and never terminated the 1994 agreement when he executed the 1999 agreement.  The key *legal* dispute in this case is a product of the third factual dispute: whether the 1999 agreement is a new contract or only a partial modification to an existing contract, or is perhaps a "substituted contract" that discharges the obligations of both parties under the 1994 agreement.

The only relevant inquiry for the court at this stage is whether it has personal jurisdiction over Chandaria on each of Echols's claims against him; that is, whether the plaintiff has made a *prima facie* showing that there is a basis under Alabama's long-arm statute to exercise jurisdiction, and that "sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  For this limited analysis, the court must, as prescribed by *Madara*, resolve all disputed allegations in the light most favorable to Echols.  Consequently, the court assumes for the purposes of the pending Motion to Dismiss that 1) Chandaria has visited Alabama several times in connection with Echols's employment, 2) that Echols was a resident of Alabama at all times relevant to his Complaint, and 3) that Echols never resigned and never terminated the 1994 agreement when he executed the 1999 agreement.

One final area of disagreement does go to the heart of the personal jurisdiction issue but is not so easily resolved, even when viewing disputed allegations in the light most favorable to Echols.  In his response brief to Chandaria's motion to dismiss, Echols

maintains that "the negotiations leading up to [the 1994 agreement], as well as the negotiations that resulted in the 1999 partial modification, are the subject of the allegations of fraud, deceit, and suppression."  (Doc. 7 at 4.)  Chandaria, on the other hand, contends that Echols only alleged the events surrounding the 1999 agreement as the basis for his fraud claims, which, if true, would mean that none of Chandaria's relevant jurisdictional contacts involved the state of Alabama.  (Doc. 9 at 2–4.)  When the court asked Echols's counsel whether he could point to any allegations in the Complaint that specifically referenced fraudulent activity taking place in Alabama, Echols's counsel replied that, "by inference," the Complaint alleged that the fraud had been ongoing since the formation of the 1994 agreement.[13]  Based on the facts as presented in the pleadings and affidavits, while Echols's claims against Chandaria might have arisen out of *obligations* contained in the 1994 agreement — specifically, the 2% sales commission that Echols has allegedly not been paid — the court finds that the basis for all of the fraud claims is Chandaria's conduct *in 1999 in Canada*, when Chandaria allegedly induced Echols to initial the 1999 agreement with the intent that Echols would be deprived of his

---

[13] In addition, when the court asked Echols's counsel whether paragraph 47 of the Complaint, the paragraph in which Echols alleged a basis for his fraudulent misrepresentation claim, confined Echols's fraud claims to the occurrences in 1999 in Canada, Echols's counsel replied that the allegations in paragraph 47 were merely an "alternative" presentation of the facts and that the court should read the other three fraud claims as alleging fraud that had been ongoing since the negotiation and execution of the 1994 agreement.  Because the court adjudicates this motion only on the basis of the pleadings and affidavits, the court cannot credit Echols's counsel's *argument* about when the fraud began as an allegation itself, and instead finds the Complaint void of any allegation that the fraud began in 1993 and 1994 with the formation of the 1994 agreement.

2% commission.  Although the court is not presently deciding a Rule 12(b)(6) motion for a failure to state a claim, or, for that matter, a Rule 9(b) motion for failure to plead a fraud claim with particularity,[14] and therefore does not concern itself with the merits of any of the claims,[15] the court does conclude for the purposes of this motion that the initial pleadings and the parties' affidavits only allege that a fraud occurred in 1999 in Canada, and not in 1993 or 1994 in Alabama.

**A. General Personal Jurisdiction**

In his response to Chandaria's motion to dismiss, Echols expressly declined to present an argument that the court has general personal jurisdiction over Chandaria "because it is so abundantly clear that Chandaria is, at minimum, subject to the 'specific jurisdiction' of this Court . . . ."  (Doc. 7 at 3.)  Even if Echols had argued that the court has general personal jurisdiction over Chandaria, the court deems Chandaria's handful of

---

[14] Counsel for Chandaria explained at oral argument that Chandaria had filed neither a Rule 12(b)(6) nor a Rule 9(b) motion because Chandaria did not want to consent to the court's personal jurisdiction.  While the court cannot locate a rule or case that would have prevented the simultaneous filing of a personal jurisdiction motion and any other defensive motion, and notes that Rule 12(g) in fact permits the joinder of multiple motions brought under Rule 12, *see* Fed. R. Civ. P. 12(g), the court recognizes that, had another motion been made, it would still likely have decided the personal jurisdiction issue before considering any other grounds for dismissal.

[15] The court is, however, skeptical that Echols has stated a claim for promissory fraud, since the critical element of such a claim that differs from a generic fraud claim is an intent not to perform possessed by the promisor at the time the promise is made.  *See Bethel*, 757 So.2d at 1159.  Echols has merely alleged that Chandaria "[made] fraudulent material representations without ever intending to actually fulfill such promises."  (Doc. 1 at ¶ 52.)  In doing so, Echols has not defined the time frame of the promises allegedly made or of the intent not to fulfill those promises such that the court can conclude that Chandaria possessed a *present* intent not to perform certain obligations.

visits over a period of several years to conduct Conros-related business, and the one real estate transaction to which Echols alludes, as insufficient to constitute such "continuous and systematic" contacts with Alabama that Chandaria should be subjected to general personal jurisdiction. *See Helicopteros*, 466 U.S. at 416–419 (holding that no general jurisdiction existed where a corporate defendant's CEO visited the state once for contract negotiations, purchased goods and services in substantial sums, accepted checks drawn from a forum state's bank, and sent personnel into the forum state for training, noting that "purchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction"). As a result, the court turns to the question of whether it has specific personal jurisdiction over Chandaria.

**B. Specific Personal Jurisdiction**

Chandaria argues that the court cannot exercise specific personal jurisdiction over him because all of Echols's claims against him, the fraud-related tort claims, arise out of and are related to the negotiation and execution of the 1999 agreement and thus do not involve contacts with Alabama. (Doc. 5 at 9–11; Doc. 9 at 2–4.) As the court has noted above, Echols's allegations of fraud, at least as pled in his Complaint and explained in the affidavits, arise *not* out events that took place in 1993 and 1994, but out of events that took place in 1999. The court therefore examines only whether specific personal jurisdiction is appropriate given Chandaria's contacts with Alabama arising from or in

relation to the allegedly fraudulent activity that took place in 1999, and concludes that it is not.[16]

### 1. Minimum Contacts

First, Echols has not made a *prima facie* showing that Chandaria had sufficient minimum contacts with Alabama directly relating to the 1999 agreement; indeed, the latest date that Echols specifically attests Chandaria was in Alabama is June 1995.  (Doc. 7-2 at ¶ 12.)  Echols's affidavit does discuss the contacts that Chandaria had with Alabama in connection with the 1994 agreement, and states that Chandaria has had "several continuous personal contacts with the State of Alabama over the years since at least 1993," some of which involved Conros business or were connected to Echols's employment agreement (*id.* at ¶ 13); however, these general assertions do not permit an inference that Chandaria had contacts with the state at any particular time since 1994, or that any contacts he might have had were related to the alleged fraud committed from 1999 onwards by inducing Echols to assent to and abide by the 1999 agreement. Furthermore, although Echols alleges that Chandaria has "done business in the State of Alabama, has arranged for the purchase of real estate in this State, and has been personally present in this State on many occasions in my presence," (*id.* at ¶ 14), this

---

[16] If Echols had alleged that the fraud began with the formation of the 1994 agreement, Chandaria might have had sufficient minimum contacts relating to that event to warrant the exercise of specific personal jurisdiction.

allegation does not present a basis for *specific* personal jurisdiction since the purported contacts do not relate to the stated claims.

When the court asked Echols's counsel at oral argument for the two precedential cases that best expressed Echols's contention that Chandaria should be subjected to specific personal jurisdiction in Alabama as a result of his contacts with the state, Echols pointed to *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), and *Shrout v. Thorsen*, 470 So. 2d 1222 (Ala. 1985), the latter of which was not mentioned in Echols's brief. According to Echols's counsel, these cases explain that any contacts Chandaria had with Alabama in 1993 and 1994 were related to the later fraud because there was a continuing business relationship between Chandaria and Echols. The court, however, finds the facts of both of these cases distinguishable from those in the instant case.

In *Burger King*, the fast food chain, which is based in Miami, Florida, sued one of its Michigan franchisees for a breach of its franchise contract. After a three-day bench trial, the Florida district court held that the two franchise operators, both Michigan residents, could be subjected to the court's jurisdiction under Florida's long-arm statute. The Supreme Court agreed with the district court, reversing the Eleventh Circuit, reasoning that the one franchise operator who had appealed had 1) established a "substantial and continuing relationship" with the company headquarters in Miami by entering into a "carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida" and by communicating directly with

16

the Miami headquarters in negotiating contracts and making franchise payments, 2)

received fair notice from the contract documents and the course of dealing that he might

be subject to suit in Florida, and that Florida law would govern all disputes, and 3) failed

to demonstrate how jurisdiction in Florida would be fundamentally unfair.  *See* 471 U.S.

at 478–85, 487.  Explaining some general principles about how a court can determine a

"contact" for the purposes of the due process analysis, especially in a case involving a

contract, the Supreme Court stated:

> If the question is whether an individual's contract with an out-
> of-state party *alone* can automatically establish sufficient
> minimum contacts in the other party's home forum, we
> believe the answer clearly is that it cannot.  The Court long
> ago rejected the notion that personal jurisdiction might turn
> on "mechanical" tests, or on "conceptualistic . . . theories of
> the place of contracting or of performance."  Instead, we have
> emphasized the need for a "highly realistic" approach that
> recognizes that a "contract" is "ordinarily but an intermediate
> step serving to tie up prior business negotiations with future
> consequences which themselves are the real object of the
> business transaction."  It is these factors — prior negotiations
> and contemplated future consequences, along with the terms
> of the contract and the parties' actual course of dealing — that
> must be evaluated in determining whether the defendant
> purposefully established minimum contacts within the forum.

*Id.* at 478–79 (internal citations omitted) (emphasis in original).  Using the approach

prescribed by the Supreme Court, then, whereas the Burger King defendants

contemplated two decades of dealings with Burger King's Florida headquarters and even

agreed to a Florida choice-of-law provision in the franchise contract, Chandaria did little

more than enter into a contract with an out-of-state resident in that resident's home forum,

an action that admittedly cannot serve as the exclusive basis for personal jurisdiction.

While Echols's employment with Conros might subsequently have turned into what could

be defined as a "substantial and continuing relationship" because Echols's employment

lasted for twelve years, there is no allegation that Chandaria envisioned having

"continuing and wide-reaching contacts" with Echols in Alabama, and indeed, Chandaria

did not have such contacts.  Because Echols has not presented sufficient evidence to show

that Chandaria had contacts within Alabama that are related to Echols's fraud claims and

that go beyond simply forming a contract with Echols in Alabama, the court cannot

conclude that Echols has established a *prima facie* case such that the exercise of specific

personal jurisdiction over Chandaria would be appropriate.

In *Shrout*, although the Alabama Supreme Court affirmed the decision of a trial

court to exercise personal jurisdiction over a nonresident defendant for a conspiracy to

defraud involving a sham loan agreement where the defendant conducted several

telephone conversations with the plaintiff representing that a loan would be made and

sent the plaintiff a letter confirming the agreement, *see* 470 So. 2d 1222, 1225 (Ala.

1985), the fraud was much more clearly deliberate and malicious in nature than that

allegedly perpetrated on Echols by Chandaria.  In fact, the *Shrout* court noted that its

finding of personal jurisdiction was "strengthen[ed]" by the plaintiff's *prima facie*

showing of a conspiracy to defraud as well as the testimony of other Alabama residents

involved in the same or similar transactions.  *Id.* at 1225–26.  Again, while the court does

not render an opinion on the sufficiency of Echols's fraud claims, there are also no allegations within the Complaint that compel the court to find that an Alabama court should, in the interests of justice, exercise personal jurisdiction over Chandaria. Furthermore, a special concurrence to the *Shrout* opinion criticized the majority's holding as being too broad, since it "seems to imply that the mere fact that an out-of-state resident is alleged to have defrauded an Alabama resident gives Alabama courts *in personam* jurisdiction over the out-of-state resident. *Id.* at 1226. The court agrees with this concurrence and notes that the *Burger King* case, decided in the same year as *Shrout*, discourages using a mere contract with a resident of another state to subject a defendant to that state's jurisdiction, as Echols attempts to do in this case. As a result, Echols has not demonstrated that Chandaria had the necessary minimum contacts with Alabama to permit the exercise of personal jurisdiction, so the court is of the opinion that Echols's claims against Chandaria are due to be dismissed on the basis of insufficient contacts alone.

### 2. Traditional Notions of Fair Play and Substantial Justice

Even if Echols had shown that Chandaria had sufficient minimum contacts with Alabama to satisfy due process, the court finds that the maintenance of the suit would so offend "traditional notions of fair play and substantial justice" that it could not exercise personal jurisdiction over Chandaria. Considering the first of the well-established factors that ensure the proper implementation of this standard, the burden on the defendant in

defending the lawsuit, it is obvious that Chandaria would encounter substantial hardships in litigating in Alabama, given that his residence and workplace is in Canada.  Second, in this case, Alabama's interest in adjudicating the dispute stems primarily from Echols's continued residency in the state, since there are no allegations that the fraudulent activity took place in Alabama.  Although a state's interest in protecting its residents from fraud is significant, the court finds the interest in the present situation mitigated by the fact that any fraud that occurred involved the 1999 agreement, which Echols executed in Canada, and not the 1994 agreement that Echols executed in Alabama.  Thus, Alabama's interest in the dispute is confined to protecting residents from fraud encountered during their activities outside the state, which seems to be a lesser interest than protecting a resident from fraud that takes place within Alabama.  Relatedly, the third factor, the plaintiff's interest in obtaining convenient and effective relief, does not necessarily weigh in favor of jurisdiction over Chandaria in an Alabama court; there is no evidence that any of the witnesses or evidence relating to Chandaria's alleged fraud are located within Alabama, and it is even unclear that Echols himself is physically located in Alabama while he works for his new company, Jarden.  The final factors, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of states in furthering fundamental substantive social policies, also support the denial of personal jurisdiction because if courts begin exercising personal jurisdiction over defendants with as attenuated contacts as Chandaria has had, the ability of the judicial system to obtain the

most efficient and substantively sound relief in controversies would almost surely be impaired as states or countries hale defendants into far-away forums with which they have had little contact and risk subjecting the defendants to relief that is inconsistent with the laws with which the defendants have purposefully availed themselves.

Applying these factors, the court finds that the exercise of specific personal jurisdiction over Chandaria would be unreasonable and would not comport with "traditional notions of fair play and substantial justice," so that even if Chandaria did have sufficient minimum contacts with Alabama, Echols has still not made a *prima facie* showing that Chandaria should be subjected to the personal jurisdiction of the court.

## IV. CONCLUSION

Based on the discussion above, the court is of the opinion that Chandaria did not have sufficient minimum contacts with Alabama, and that the exercise of personal jurisdiction over Chandaria would offend "traditional notions of fair play and substantial justice." Consequently, the exercise of personal jurisdiction does not satisfy the Fourteenth Amendment's due process requirements and does not comport with the Alabama long-arm statute that would otherwise authorize a suit against a non-Alabama resident. Without a *prima facie* showing of either general or specific personal jurisdiction, Echols cannot maintain his claims against Chandaria. Therefore, an Order granting Chandaria's Motion to Dismiss for Lack of Personal Jurisdiction, (doc. 5), and dismissing all of Echols's claims against Chandaria, will be entered contemporaneously

with this Memorandum Opinion.

**DONE** this 30th day of March, 2009.

_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE