# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JACK W. ECHOLS, JR., | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV 2:08-0219-SLB |
| | } | |
| CONROS CORPORATION, | } | |
| | } | |
| Defendant. | } | |

## <u>MEMORANDUM OPINION</u>

This case is currently before the court on defendant Conros Corporation's ("Conros") Motion in Limine to Exclude Proposed Expert Opinion Testimony from James L. Hart, (Doc. 53),[1] and its Motion for Summary Judgment, (Doc. 55). Also before the court is plaintiff Jack W. Echols, Jr.'s ("Echols") Motion to Extend the Page Limit for Summary Judgment Response Memorandum. (Doc. 60.) Echols, a former employee of Conros, has sued Conros for breach of contract, alleging unpaid bonuses. (Doc. 47 at ¶¶ 34-37.) Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court finds that Conros's Motion in Limine to Exclude Proposed Expert Opinion Testimony from James L. Hart, (Doc. 53), is due to be denied as moot, and its Motion for Summary Judgment, (Doc. 55), is due to be denied. Echols's Motion to Extend the Page Limit for Summary Judgment Response Memorandum, (Doc. 60), will be granted.

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

## I. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and, therefore, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *See id.* at 255. Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every *reasonable* inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of*

*Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)) (emphasis added).

## II.  <u>FACTUAL AND PROCEDURAL HISTORY</u>[2]

Conros is a Canadian corporation headquartered in Toronto, Canada, which manufactures and sells various consumer products, including firelogs, glue, and tape. (Doc. 56 at 3; Doc. 57, Ex. A at 58-60.)  In late 1993 and early 1994, seeking to expand its firelog division, Conros, through its president and chief executive officer, Navin Chandaria ("Navin"), entered into negotiations with Echols, an Alabama resident then working in the food brokerage business in Birmingham, Alabama.  (Doc. 56 at 3-4; Doc. 57, Ex. A at 58-60, 135-38, Ex. B at 9, 22-25.)  Specifically, Navin wanted Echols to join Conros and expand its firelog division by obtaining accounts with Walmart and Sam's Club.  (Doc. 56 at 4; Doc. 57, Ex. A at 49-51.)  Navin and Echols began negotiating an employment agreement, and Echols sent Navin certain terms that he wanted included in the agreement.  (Doc. 56 at 4; Doc. 57, Ex. A at 200-04, Ex. B at 134-37, Ex. C.)  Subsequently, on February 16, 1994, Echols and Navin entered into an employment agreement (the "1994 Agreement"), which provided an effective date of May 1, 1994.  (Doc. 56 at 4; Doc. 57 at Ex. D.)

---

[2] For purposes of summary judgment, except where specifically addressed, the court has resolved all disputed facts and reasonable inferences in favor of Echols, the non-movant.  *See Anderson*, 477 U.S. at 255; *Graham*, 193 F.3d at 1282.

**A.     THE 1994 AGREEMENT**

The 1994 Agreement stated that Echols "w[ould] be responsible for all the firelog sales for food retail outlets, initially, and to be extended to other areas as the time goes." (Doc. 57, Ex. D at ¶ F.)  The agreement provided for an initial employment term of three years, which could be mutually extended by the parties.  (*Id.* at ¶ A.)  The 1994 Agreement also included a clause specifying Echols's compensation, which reads: "Base Salary - $150,000 per annum + 2% of Conros's sales to Walmart and Sams." (*Id.* at ¶ B.)  The parties dispute when Conros was to pay the 2% commissions; Conros alleges that the commissions were to be paid annually, while Echols maintains that Conros agreed to defer paying the commissions until Echols left Conros, so as to provide for his retirement.[3]  (Doc. 56 at 5; Doc. 57, Ex. A at 153-55, Ex. B at 177-78; Doc. 61 at 4.)  The parties also dispute what the commission was to cover; Conros asserts that the commission covered only firelog sales, while Echols contends the commission encompassed both firelog and glue sales.  (*See* Doc. 56 at 5-7; Doc. 61 at 5; Doc. 61 at Ex. 1.)

Conros did not make any sales to Walmart or Sam's during Echols's first year of employment, and, for that reason, Echols was not entitled to a commission.  (*See* Doc. 56 at 6; Doc. 57, Ex. B at 171, Ex. D, Ex. F; Doc. 63 at Ex. N.)  Nevertheless, on October 6, 1995,

---

[3] Echols has admitted that it is a "fair statement" to say that, initially,  he expected to receive a commission "at least yearly." (Doc. 57, Ex. B at 159-60.)  However, Echols testified that, "early on," the parties agreed to defer the commission payments.  (*Id.* at 177-78.)  This agreement seemingly refers to the oral deferral allegedly agreed upon in approximately October or November of 1998, although Echols's testimony can also be interpreted to indicate an earlier understanding. (*See* Doc. 47 at ¶ 23; Doc. 56 at 8-9; Doc. 57, Ex. B at 177-78; Doc. 61 at 6-7.)  *See infra* Part II.B.

4

Conros paid Echols "a one time special bonus" of $20,000, specifying by letter that the bonus was a "token of appreciation for having [Echols] on board."[4]  (Doc. 56 at 6; Doc. 57, Ex. A at 249, Ex. B at 171, Ex. F.)  Echols accepted the bonus by reply letter.  (Doc. 61 at Ex. N.)

Thereafter, in the years 1996, 1997, and 1998, Conros made sales to Walmart and Sam's, thereby entitling Echols to a commission under the 1994 Agreement, although the commissions owed were generally small in size.  (Doc. 56 at 7; Doc. 57, Ex. A at 154-55, 199, Ex. B at 19-20, 177-78, Ex. H.)[5]  Navin testified that not only did Conros pay these

---

[4] In the letter, Navin stated that "[i]t [was] unfortunate that the sales to Walmart and Sams did not materialise to [he and Echols's] expectations during the 1st year," but made clear that Conros "ha[d] full confidence that the sales w[ould] result in [the parties'] original expectations by the end of the 2nd year thus allowing [Echols] to earn the bonus."  (Doc. 57 at Ex. F.)

[5] Echols contends that the court should strike Exhibit H of Conros's Evidentiary Submission, (Doc. 57 at Ex. H), arguing that the documents contained therein are unauthenticated and inadmissible, (Doc. 61 at 6 n.3).  Despite Echols's citation to the general rule, (*see id.*), that "[i]nadmissible hearsay . . . 'cannot be considered on a motion for summary judgment,'" *McCaskill v. Ray*, 279 F. App'x 913, 915 (11th Cir. 2008) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)), the court notes that the United States Court of Appeals for the Eleventh Circuit has long held that "inadmissible hearsay may sometimes be considered by a court when ruling on a summary judgment motion," *see Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) (citing *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1530 (11th Cir. 1993)).  Indeed, if the court finds that the otherwise inadmissible hearsay can be reduced to admissible form at trial, the court may consider it for purposes of a motion for summary judgment.  *See id.  See also Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible *or that could be presented in an admissible form*." (*citing Pritchard*, 92 F.3d at 1135)) (emphasis added).  Here, Conros points out that "[b]oth documents [contained in Exhibit H] are bates labeled and were produced in discovery.  The figures contained in those sales records have also been incorporated in Conros's sworn discovery responses.  More importantly, **these figures are part of the total number of firelog sales stipulated by the parties**."  (Doc. 63 at 4 (citing Doc. 59).)  Therefore, Conros asserts that the court should consider Exhibit H in determining whether Conros made sales to Walmart or Sam's in 1996.  (*Id.* at 3-4.)  The court agrees.  Simply put, because the court finds that Conros has demonstrated that the exhibit could be reduced to admissible form at trial, the court will consider the exhibit for purposes of summary judgment.  However, the court expresses no further opinion as to the admissibility of Exhibit H at this time.

commissions to Echols by providing him with a bonus in each of these years, but further that the bonus payments greatly exceeded what Conros owed Echols on the commissions.[6] (Doc. 57, Ex. A at 153-54.) By contrast, Echols testified that Conros never paid him a commission, and that Conros paid the bonuses merely to reward his "hard work."[7] (Doc. 56 at 7; Doc. 57, Ex. B at 172, 177, 188-89.)

## B.   THE 1998 ORAL DEFERRAL

In approximately October or November of 1998, Echols allegedly approached Navin and Dhiren Chandaria ("Dhiren")[8] to discuss deferring his commissions until he retired or otherwise left Conros. (Doc. 47 at ¶ 23; Doc. 56 at 8-9; Doc. 57, Ex. B at 177-78, 183-85.) Echols testified that the conversation took place at Conros's Toronto office, and that, specifically, he told Navin and Dhiren that because the 2% commissions had been so small, that he would like to defer the payments until he retired or otherwise left the company. (Doc. 57, Ex. B at 183-84.) Echols added that he desired the deferral because Conros did not have a retirement plan, and therefore the commissions would help provide for his retirement. (*Id.*

---

[6] The bonus payments for the years 1996, 1997, and 1998 each amounted to $35,000. (Doc. 57, Ex. G at 4-6.)

[7] Echols acknowledged that Conros may have paid him a commission covering Conros's first glue sales to Walmart, although he noted he is not certain. (Doc. 57, Ex. B at 188; Doc. 61 at 7.)

[8] Dhiren is Navin's brother. (Doc. 56 at 6; Doc. 57, Ex. A at 17.) He worked at Conros from 1989 to 2006, headed the firelog division, and reported to Navin. (Doc. 56 at 6 n.3; Doc. 57, Ex. A at 59-60.)

at 19-20, 183-84.)  Regarding Conros's response, Echols testified that while he could not

remember the exact details, Navin and Dhiren gave "no push back," "did not say no," and

"obliged" his request.  (*Id.* at 195-97.) Echols claims that the parties' "[e]veryday dealings,"

their "course of dealing," demonstrated Conros's acceptance.[9]  (*Id.* at 196-97.)  On the other

hand, Conros disputes that the parties agreed to defer Echols's commission payments, and

instead asserts that the parties reached a significantly different agreement.  (*See* Doc. 57, Ex.

A at 193-200.)   Specifically, Navin testified that in January of 1999, because the 2%

commissions had been so small, Conros decided to increase Echols's salary from $150,000

per year to $200,000 per year, and consequently to eliminate any future commission

payments.  (*Id.* at 193-200, 231.)  Navin added that this oral agreement controlled until the

parties entered into a subsequent written agreement in May of 1999, which Navin contends

largely memorialized the prior oral agreement.  (*See id.* at 193-200, 232-33.)


C.    **THE 1999 AGREEMENT**

In April and May of 1999, Conros negotiated with, and eventually purchased, Pine

---

[9] Echols testified that he lacks any records specifically evidencing Conros's acceptance, and further acknowledged that he did not inquire as to how Conros would document the amount owed, whether it would open an interest bearing account, or whether it would invest any portion of the funds. (Doc. 57, Ex. B at 189-92.) Instead, Echols stated that the parties' conversation "never got that specific," and that he simply assumed Navin would open an account and invest appropriately. (*Id.* at 191-92.) That said, Echols did testify that he "kept up with [the amount owed]," and that he preserved the relevant documents in a file folder.  (*Id.* at 70-71, 191.)  However, Echols contends that Conros retained possession of the file folder, along with all of his other files, after he left Conros.  (*Id.* at 71.)

Mountain Corporation ("Pine Mountain"), a company engaged in firelog sales, which significantly increased Conros's firelog division.  (Doc. 56 at 9-10; Doc. 57, Ex. A at 23-24.)  At approximately the same time, M & H Foods, which manufactures Moore's steak sauce, approached Echols and offered Echols an employment opportunity with the company.  (Doc. 56 at 10; Doc. 57, Ex. B at 222-30.)  Echols seriously considered the opportunity, and therefore informed Conros of the offer in May of 1999.  (Doc. 56 at 10; Doc. 57, Ex. B at 229-30, 235-37.)  Although Navin testified that Echols actually resigned from Conros at this time, Echols refutes this accusation, and maintains that he never resigned.  (Doc. 56 at 10; Doc. 57, Ex. A at 26-30, Ex. B at 235-37.)  Nevertheless, because of the recent acquisition of Pine Mountain, and given M & H Foods's recent interest in hiring Echols, Navin approached Echols and, on May 13, 1999, the two entered into a separate, handwritten agreement (the "1999 Agreement").  (Doc. 56 at 10; Doc. 57, Ex. B at 234-38, Ex. I.)

The 1999 Agreement contained additional, and in part different terms covering Echols's employment at Conros.  (*Compare* Doc. 57 at Ex. D, *with* Doc. 57 at Ex. I.)  Specifically, the 1999 Agreement provided Echols with a new base salary of "USD $200,000 + car, plus see the below."  (Doc. 57, Ex. I at 1.)  "[T]he below" referred to an incentive-based bonus structure, whereby "[i]f [Conros] achieve[d] first year C $12m and thereafter C $10m bottom line before tax every year as confirmed by Price Waterhouse then [Echols would receive] $50,000 per year for 5 years max $250,000 (to cover up his loss of $225,000 he took when he sold his business in Alabama)."  (*Id.*)  The 1999 Agreement also clarified,

regarding how to calculate the benchmarks, that there could be "[n]o [a]veraging with an exception of averaging only forward i.e. if year 1 was $15m & year 2 was $5m then year 2 OK since average is $10m but if year one $5m & year 2 $15m then not acceptable, Details to be finalized." (*Id.* at 2.) The 1999 Agreement additionally provided that "[i]f sales target of $10m P.A. [per annum] not achieved every year after year 2 (year one is $7m) then Conros has right to cancel without severance." (*Id.*) Apart from the salary and bonus provisions, the 1999 Agreement also called for a "$1m insurance policy for death," as well as an "[i]nsurance policy having cash value of US $500,000 at the end of 10 years."[10] (*Id.* at 1.) Notably, the 1999 Agreement does not mention the 1994 Agreement, nor address Conros's obligation to pay Echols a 2% commission on sales to Walmart and Sam's Club. (*See generally id.*)

While both Navin and Echols signed the 1999 Agreement, the parties dispute its legal effect, with Conros positing that it completely supersedes the 1994 Agreement, and Echols maintaining that it constitutes a "legal nullity," which "does not meet the elements necessary for valid contract formation."[11] (*See* Doc. 47 at ¶ 1001; Doc. 56 at 11-12; Doc. 61 at 37-38.) Primarily, the parties dispute whether Conros's obligation under the 1994 Agreement to pay

---

[10] Both parties agree that Echols is due $500,000 pursuant to the 1999 Agreement. (Doc. 57, Ex. A at 193-94, Ex. B at 16-18.) However, Conros asserts that the $500,000 payment constitutes the entirety of what it owes. (Doc. 56 at 12-13; Doc. 57, Ex. A at 193-94.)

[11] It is noteworthy that, alternatively, Echols has also alleged that, at most, the 1999 Agreement simply modified the 1994 Agreement, adding additional terms. (Doc. 47 at ¶ 21; Doc. 61 at 7-8, 37-38.) Nevertheless, despite this alternative position, Echols has made clear that "[he] has neither pled nor made a claim for 'breach of th[e] 1999 Agreement." (Doc. 61 at 37.)

Echols a 2% commission on sales to Walmart and Sam's Club survived the 1999 Agreement. (Doc. 56 at 11-12; Doc. 57, Ex. A at 159-60, Ex. B at 16-18.)  Despite this dispute, subsequent to the 1999 Agreement, Conros increased Echols's salary to $200,000 per year, and also paid Echols an annual bonus of $50,000 in 1999, 2000, 2001, 2002, and 2003; the bonuses thereafter increased to $75,000 in 2004, $100,000 in 2005, and $100,000 in 2006.[12] (*See* Doc. 56 at 11; Doc. 57, Ex. B at 269-74, Ex. G at 7-14.)

### D.    THE 2006 SALE OF CONROS'S FIRELOG DIVISION

In September of 2006, Conros agreed to sell its firelog division to Jarden Corporation ("Jarden").  (Doc. 56 at 13; Doc. 57, Ex. A at 111-14, 171, Ex. B at 11, 57-60.)  As a condition of the acquisition, Jarden requested that Echols accept employment at Jarden and head its firelog division.  (Doc. 56 at 13; Doc. 57, Ex. A at 187-88, Ex. B at 57-60.)  Both Conros and Echols agreed, and Echols's employment at Conros ended at that time.  (Doc. 56 at 13; Doc. 57, Ex. A at 187-88, Ex. B at 60.)

---

[12] In his Response to Conros's Motion for Summary Judgment, Echols disputes Conros's assertion that he "accepted compensation payments from the company consistent with the base salary and bonuses called for in the 1999 agreement," and instead avers that his  salary "fluctuated from what was called for in the 1999 'draft of additional terms.'"  (Doc. 61 at 8; Doc. 56 at 11.)  However, despite the court's Summary Judgment Requirements, (*see* Doc. 18, Ex. A at 4), Echols has not cited any evidence to support this denial, (*see* Doc. 61 at 8).  Furthermore, during his deposition, Echols testified and acknowledged that Conros paid him a salary that coincided with the terms of the 1999 Agreement.  (Doc. 57, Ex. B at 269-74.)

**E.     ECHOLS'S DEMANDS FOR PAYMENT AND SUBSEQUENT LAWSUIT**

Following his departure from Conros, Echols sent a series of letters and emails to Navin, dated July 27, 2007, August 6, 2007, and August 27, 2007, seeking compensation allegedly owed by Conros under the 1994 and 1999 Agreements. (*See* Doc. 57, Ex. J, Ex. K, Ex. L.) While Echols proposed a $1 million dollar settlement in the initial July 27, 2007 letter, in the following two emails, he instead pointed out what Conros allegedly owed him under the 1994 and 1999 Agreements, and requested that Conros compensate him accordingly. (*Id.* at Ex. J, Ex. K, Ex. L.) However, Conros refused to remit the demanded sum, and Echols then took legal action, filing his initial Complaint on February 6, 2008. (*See* Doc. 1; Doc. 56 at 14.)

On January 14, 2010, Echols filed an Amended Complaint. (Doc. 47.) In the Amended Complaint, Echols asserts one count against Conros, alleging breach of contract with respect to the 1994 Agreement, as modified by the 1998 oral deferral. (*Id.* at ¶¶ 34-37; Doc. 61 at 37-39.) Thereafter, on March 29, 2010, Conros filed its Motion for Summary Judgment.[13] (Doc. 55.) Contemporaneously with the Motion, Conros filed a Memorandum in Support of its Motion for Summary Judgment, (Doc. 56), as well as its Evidentiary Submission in Support of its Motion for Summary Judgment, (Doc. 57). In response, Echols,

---

[13] Prior to filing its Motion for Summary Judgment, Conros filed a Motion in Limine to Exclude Proposed Expert Opinion Testimony from James L. Hart, Echols's expert on damages. (Doc. 53.) However, the parties subsequently entered into a joint stipulation regarding damages, (*see* Doc. 59), and Echols withdrew the expert report of James L. Hart, "stipulat[ing] he will use no expert witness at the trial of this matter," (*id.* at 2). The Motion is therefore due to be denied as moot.

11

on April 19, 2010, filed both a Response to Conros's Motion for Summary Judgment, (Doc. 61), as well as an Evidentiary Submission in Support of his Response to Defendant Conros's Motion for Summary Judgment, (Doc. 62).  Conros filed its Reply in Support of its Motion for Summary Judgment on April 30, 2010, attaching two additional evidentiary submissions. (Doc. 63.)  The court held oral argument on all pending motions on July 23, 2010.

## III.  <u>DISCUSSION</u>

In its Motion for Summary Judgment, Conros asserts that Echols's Amended Complaint is due to be dismissed as a matter of law, as no genuine issues of material fact exist.  (Doc. 55 at 1.)  Particularly, Conros argues: A) that "[Echols's] breach of contract claim is not timely" under the applicable statute of limitations, B) that Echols's contention that the parties modified the 1994 Agreement through the 1998 Oral Modification has "no basis in law or fact," C) that "[a]ssuming *arguendo* that Echols's breach of contract claim is not barred by the Statute of Limitations, Echols has impliedly waived any right to recover unpaid commissions under the two-percent commission provision of the 1994 agreement," and D) that "there is no genuine issue of material fact, and judgment as a matter of law is due to be entered resolving the dispute about the validity of the 1999 agreement."  (Doc. 56 at 15-27.)  The court will address each argument in turn.

12

A.     **CONROS'S STATUTE OF LIMITATIONS ARGUMENT**

First, Conros maintains that "[Echols's] breach of contract claim is not timely." (*Id.* at 15.) Specifically, Conros asserts that Echols was due a 2% commission on certain sales to Walmart and Sam's, and that "[i]t is undisputed that the parties understood that Echols was to receive the commissions at least annually." (*Id.* at 15-16.) Conros further argues that "[t]here is also no dispute that Conros made sales . . . to Walmart at least as of 1996 thereby entitling Echols to a commission." (*Id.*) However, Conros claims that, according to Echols, he "did not receive a sales commission in that year," and that he "denies that any bonus paid to him was intended to or did satisfy the commission obligation." (*Id.*) Therefore, Conros alleges that "Echols' breach of contract claim accrued not later than 1996," and that, "[b]ecause Echols did not file his Complaint against Conros until February 6, 2008, his breach of contract claim is time-barred under Alabama's six-year statute of limitations." (*Id.*)

In response, Echols insists that "Conros' [statute of limitations] affirmative defense argument . . . is backwards–it doesn't assume the *plaintiff's facts* as true, as it should, but instead, necessarily relies upon the assumption that *Conros' facts* are true." (Doc. 61 at 10.) Echols points out that "the contract itself is undisputedly silent as to *when* any commissions were to be paid," and that, "as to the alleged 'breach' in 1996, there is *disputed evidence* as to both: (a) whether Echols ever *received* commission payments during this timeframe; and (b) whether Echols was *entitled* to commission payments during this timeframe (i.e., whether applicable sales to Walmart and Sam's even occurred during this timeframe." (*Id.* at 12.)

Initially, the court disagrees that a genuine issue of material fact exists regarding whether sales to Walmart and Sam's occurred in 1996.  Indeed, Exhibit H to Conros's Evidentiary Submission in Support of its Motion for Summary Judgment details numerous glue sales to Walmart occurring in 1996, as well as at least one firelog sale.  (*See* Doc. 57 at Ex. H.)  And, while Echols disputes the authenticity of Exhibit H, (*see* Doc. 61 at 12-13), the court, as aforementioned, *see supra* note 5, will consider Exhibit H for purposes of summary judgment.  In addition, the court also disagrees, for purposes of summary judgment, that a genuine issue of fact exists as to whether Echols received commission payments during this time frame.  With the exception of Conros's first glue sale to Walmart in 1996, which Echols acknowledged Conros may have paid, though he "seem[ed] to think" no payment occurred, Echols testified that Conros did not pay any other commissions, and disputed Navin's suggestion that the annual bonus payments offset Conros's obligation to pay the commissions.[14]  (Doc. 57, Ex. B at 177-78, 188-89.)  Thus, for purposes of summary judgment, the court finds that sales entitling Echols to a commission occurred as early as 1996, but that Conros has yet to pay Echols all commissions earned that year.[15]

_____

[14] It is important to note that the annual bonus payments do not specify that they are in lieu of, or in addition to, Conros's obligation to pay commissions, nor do the payment amounts correspond to Conros's annual sales to Walmart and Sam's.  (*See* Doc. 57, Ex. A at 159-61, Ex. B at 172, 177, 188-89, Ex. G.)  So, while Conros may be correct regarding the purpose of the annual bonuses, the court nonetheless finds a genuine issue of material fact as to whether the bonus payments were intended to offset commissions due Echols.

[15] It is necessary to address the arguments raised by Echols premised on Conros's version of the facts, particularly Conros's claim that it paid all of Echols's commissions until 1999, when the parties entered into the 1999 Agreement, and Conros's position that, under the 1994 Agreement,

14

For all that, in determining the propriety of Conros's statute of limitations argument, it remains necessary to address when the 1994 Agreement obligated Conros to pay Echols's commissions, as Echols's breach of contract claim could not accrue until after the commissions had become due. *See, e.g., Ishler v. C.I.R.*, 442 F. Supp. 2d 1189, 1217 (N.D. Ala. 2006) ("The [breach of contract] claim accrues on the date the contract is breached . . . ." (citing *AC, Inc. v. Baker*, 622 So. 2d 331, 333, 335 (Ala. 1993))); *see also Miss. Valley Title Ins., Co. v. Hooper*, 707 So. 2d 209, 213 (Ala. 1997) ("In a breach of contract action . . . the limitations period runs from the time the contract is broken . . . ." (citing *Stephens v. Creel*, 429 So. 2d 278 (Ala. 1983))). As stated above, Conros asserts that "[i]t is undisputed that the parties understood that Echols was to receive the commissions at least annually," (Doc. 56 at 15-16), while Echols contends that the commissions "were due upon his departure or retirement from Conros," (Doc. 61 at 17).

---

Echols was due commissions on firelog sales only, not glue sales. (*See* Doc. 61 at 12-14.) Echols points out Conros's positions on these two issues to show deficiencies in Conros's statute of limitations argument, noting that a breach of contract claim could not accrue in 1996 if Conros indeed paid the commissions, and that a claim could also not accrue if no applicable sales occurred. (*See id.*) Simply put, the court agrees with Conros, (*see* Doc. 63 at 6 & n.5), and finds these arguments to be unpersuasive, as both are based on Conros's version of the facts. For purposes of summary judgment, the court must accept the non-movant's version of the facts as true, even when the moving party's conflicting version proves beneficial to counter certain arguments. *See Anderson*, 477 U.S. at 255 ("[E]vidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Stated differently, the court will not assume as true that Conros paid all of Echols's commissions until 1999 to negate Conros's statute of limitations argument, while, at the same time, also assume as true that Conros never paid any of Echols's commissions, with the possible exception regarding the first glue sale, to support Echols's breach of contract cause of action for all unpaid commissions from May 1, 1994, to September 1, 2006. *See Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010) ("The purpose of judicial estoppel is 'to protect the integrity of the judicial process by prohibiting parties from changing positions according to the exigencies of the moment." (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001))).

Section 8-24-2 of the Alabama Code specifies when a principal is required to pay commission payments to a sales representative, providing that:

> (a) The terms of the contract between the principal sales representative shall determine when a commission is due.
>
> (b) If the time when the commission is due cannot be determined by a contract between the principal and sales representative, the past practices between the parties shall control, or if there are no past practices, the custom and usage prevalent in this state for the business that is the subject of the relationship between the parties shall control.
>
> (c) All commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within thirty days after the date of termination. Commissions that become due after the termination date shall be paid within thirty days after the date on which the commissions become due.

Ala. Code § 8-24-2(a)-(c) (1975).

In the instant case, the 1994 Agreement provides only that: "Base Salary - $150,000 per annum + 2% of Conros' sales to Walmart and Sams." (Doc. 57, Ex. D at ¶ B.) Conros asserts that the 1994 Agreement is not silent as to when the commissions were due, arguing that "[t]he language of the contract suggests that the commissions were payable annually along with the base salary." (Doc. 63 at 5.) By contrast, Echols claims that the 1994 Agreement "is undisputedly silent as to *when* any commissions were to be paid." (Doc. 61 at 12.) The court agrees. Simply put, the only language contained in the 1994 Agreement that could designate a time for payment are the words "per annum." (Doc. 57, Ex. D at ¶ B.) However, "per annum" directly modifies "$150,000," not Conros's obligation to pay the 2% commissions. (*See id.*) And, at any rate, according to its plain meaning, "per annum" evidences only that Conros was to pay Echols $150,000 *per year*, leaving silent when, and how often, payment of the $150,000 was to occur. *See Harbison v. Strickland*, 900 So. 2d

16

385, 391 (Ala. 2004) ("'[A] court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.'" (quoting *Turner v. West Ridge Apartments, Inc.*, 893 So. 2d 332 (Ala. 2004))); *see also Nat'l Treasury Employees Union v. I.R.S.*, 735 F.2d 1277, 1279 (11th Cir. 1984) ("'Courts cannot read into a . . . contract that which is not there.'" (quoting *Sw. E & T Suppliers v. Am. Enka Corp.*, 463 F.2d 1165, 1166 (5th Cir. 1972))).  Thus, drawing all reasonable inferences in favor of Echols, the court agrees that the 1994 Agreement is silent, indicating a latent ambiguity,[16] as to when Conros was required to pay the commissions, and, therefore, "the past practices between the parties shall control."  Ala. Code § 8-24-2(b).

Although evidence of the parties' "past practices" in paying the 2% commissions is somewhat limited, the evidence submitted by Conros nevertheless supports its view that, at least initially, commission payments were due annually.  (*See* Doc. 57, Ex. A at 153, Ex. B at 159-60, Ex. F.)  Primarily, after Echols's first year with Conros, when it is undisputed that no applicable sales had yet occurred, Echols received a $20,000 bonus.  (*See* Doc. 57 at Ex. F.)  In paying the 1995 bonus, Navin sent Echols a letter, which clarified that the $20,000 bonus constituted a "token of appreciation for having [Echols] on board."  (*Id.*)  Navin's letter also mentioned his disappointment with the lack of sales to Walmart and Sam's during the first year, yet reassured Echols that Conros "ha[d] full confidence that sales will result

---

[16] The Supreme Court of Alabama has noted that "a clear and obvious omission or silence in a contract that indicates the existence of a latent ambiguity . . . opens the door to extrinsic evidence of an alleged collateral agreement."  *Prince v. Poole*, 935 So. 2d 431, 444 (Ala. 2006) (quoting *Lankford v. Witmondt*, 528 So. 2d 850, 853 (Ala. 1988)) (internal quotation marks omitted).

in our original expectations by the end of the 2nd year thus allowing you to earn the bonus."

(*Id*.)  In a reply letter, Echols thanked Navin and Dhiren for the bonus, and expressed a similar optimism regarding the company's future.  (Doc. 63 at Ex. N.)

Echols's own testimony during his deposition also supports a finding that, initially, Conros was obligated to pay the commissions at least annually:

> Q.    Okay.  Now, I think I asked you this before, but let me make sure I remember, your expectation was that you would receive a salary each year?
> A.    Correct.
> Q.    Was your expectation that you would receive a commission each year as well?
> A.    On initial startup, yes.
> Q.    Okay.  Would you receive a commission on a monthly basis; was that your expectation?
> A.    At the beginning, yes.
> Q.    You agree that monthly is not written here [in the 1994 Agreement], right?
> A.    Correct.
> Q.    Did you and Mr. Chandaria agree, though, that you would be paid monthly, a monthly commission?
> A.    I can't remember if we decided when it would be paid.
> Q.    But your expectation was that you would receive it at least yearly; is that fair?
> A.    That's a fair statement.

(Doc. 57, Ex. B at 159-60.)  And, Navin's testimony likewise supports this conclusion:

> Q.    Jack [Echols] had a contract for a percentage sales commission, though, didn't he?
> A.    Combination of commission and salary, yes.
> Q.    Right.  But he never actually earned, never got paid any commission, did he?
> A.    He did get paid a commission.  When you say "never got paid," he got paid commission until we changed the contract.
> Q.    He did get paid a commission?
> A.    Yes, sir.
> Q.    When?
> A.    Every year there's a bonus which we gave him.  That was in lieu of commission and bigger amount than commission.

(*Id.*, Ex. A at 153.)  Based on this evidence, the court agrees with Conros, and, for purposes

18

of summary judgment, finds that, initially, the commissions were due at least annually. However, this finding does not resolve Conros's statute of limitations argument.  Indeed, Echols maintains that, in late 1998, at his request, Conros agreed to defer paying his commissions until Echols left or retired from Conros.  (Doc. 47 at ¶ 23; Doc. 56, Ex B at 177-78, 183-85.)  The court addresses this issue below.[17]

## B.   CONROS'S ARGUMENT THAT THE ALLEGED ORAL DEFERRAL HAS NO BASIS IN LAW OR FACT

Echols maintains that Conros's statute of limitations argument is without merit because the parties orally agreed, in October or November of 1998, that Conros would defer Echols's commission payments until Echols left or retired from the company.  (Doc. 47 at ¶ 23; Doc. 56, Ex B at 177-78, 183-85.)  Challenging the assertion, Conros raises a number of grounds in opposition to the deferral, summarizing that "[t]here is . . . no basis in law or fact for Echols' novel theory."  (Doc. 56 at 17.)  The court will address these arguments in turn.

---

[17] An additional issue exists concerning whether the 1994 Agreement constitutes an entire, indivisible contract, in which only one breach could occur, an interpretation suggested  by Conros, (*see* Doc. 63 at 2-3), or a severable contract, in which multiple breaches could occur.  *See* Ala. Code § 6-5-280 (specifying the difference between entire and severable contracts).  However, because the court agrees that a genuine issue of material fact exists regarding whether the parties agreed to defer the commissions until Echols left or retired from Conros, and because this dispute forecloses Conros's statute of limitations argument, *see infra* Part III.B., it is, at this time, unnecessary to address whether the 1994 Agreement is entire or severable.

1.   CONROS'S ARGUMENT THAT ECHOLS HAS NO FACTUAL SUPPORT FOR
      THE 1998 DEFERRAL AGREEMENT

Conros first argues that "Echols has failed to present any evidence to establish that

Conros accepted in any form or fashion an alleged proposal to defer his commission

payments."   (*Id.* at 19.)   Rather, Conros maintains that while Echols asked that the

commissions be deferred until he retired or left the company, Conros never accepted.  (*See*

*id.* at 18-19.)  Instead, Conros asserts that Echols relies solely on its silence, and the parties'

"course of dealing," as evidence of its acceptance, but that "[i]t is black letter contract law

that offers cannot be accepted by the offeree's silence."   (*Id.* at 18 (citing *Denson v.*

*Kirkpatrick Drilling Co.*, 144 So. 86, 91 (Ala. 1932)).)   Therefore, Conros argues that

"Echols' alleged oral modification is nothing more than a misty assertion, which is wholly

insufficient to create a genuine issue of material fact."   (*Id.* at 19 (internal footnote and

citation omitted).)

In response, Echols initially disputes labeling the 1998 deferral agreement as a

"modification," or "as a new, different, and inconsistent term from his 1994 employment

contract," arguing that the agreement to defer the commissions "is simply an explanation of

how commissions were to be paid in the context of a written contract that says nothing about

when performance is due."  (Doc. 61 at 15-16.)  As such, "Echols contends . . . that no

evidence is even necessary since there was nothing in the [1994] contract to modify given

it's [sic] total silence on the time set for performance."  (*Id.* at 30.)  Still, Echols contends

that, though limited, his deposition testimony constitutes sufficient and admissible evidence

20

to support the deferral arrangement.  (*See id.*)  Specifically, Echols points out that although "he could 'not remember the exact word[s]' used by [Navin and Dhiren] during the discussion that his commissions would be deferred . . . [that it] was clear that [they] 'obliged' to the request . . . and that there was a mutual understanding on the issue."  (*Id.* (citing Doc. 57, Ex. B at 177-78, 196-97).)  Echols adds that this mutual understanding "is further supported by the parties' course of dealing over many years."  (*Id.* at 31 (footnote omitted).)

The court agrees that Echols's deposition testimony is sufficient to raise a genuine issue of material fact as to whether the parties orally agreed to defer the commissions until Echols retired or otherwise left Conros.  Echols testified that in response to his deferral request, that "[he didn't] remember the exact details, but there was no push back," that "[Navin and Dhiren] did not say no.  They obliged . . . ."  (Doc. 57, Ex. B at 196-97.)  Simply put, whether labeling the alleged 1998 deferral as a modification to, or explanation of the 1994 Agreement, it remains that, under Alabama law, "'[c]ontracting parties are free to modify their contract by mutual assent,'" *see Lightsey v. Orgill Brothers & Co., Inc.*, 454 So. 2d 1002, 1005 (Ala. Civ. App. 1984) (quoting *Kinmon v. J.P. King Auction Co.*, 276 So. 2d 569 (Ala. 1973)), "[a]nd, since mutual assent is a factual issue, it must be determined by the jury," *id.* (citing *Cook v. Sweatt*, 209 So. 2d 891 (Ala. 1965)).  *See also Stockton v. CKPD Development Co.*, 982 So. 2d 1061, 1067 (Ala. 2007) ("It is well established that a dispute concerning the intent of contracting parties is a question of fact that should be resolved by the factfinder." (citing *ISS Int'l Serv. Sys. Inc. v. Ala. Motor Express, Inc.*, 686 So. 2d 1184,

1187 (Ala. Civ. App. 1996))); *Lindy Mfg. Co. v. Twentieth Century Mktg., Inc.*, 706 So. 2d

1169, 1173 (Ala. 1997) (reiterating in a case involving unpaid sales commissions that "'[i]t

is a rule that when the contract is verbal the jury must find its terms.  True, there is a field for

the court, when there is no conflict in the evidence and the terms are positively stated, so that

they need only be construed.  But, though no conflict may exist in the evidence, if the

intention of the parties is doubtful, the jury must determine what agreement was made.'"

(quoting *Keel v. Weinman*, 98 So. 2d 611, 614 (Ala. 1957))); *Jeff D. Jordan & Co. v. Yancey

& Abernathy*, 6 So. 2d 473, 474 (Ala. 1942) ("It is, however, recognized that parties to an

executory contract may alter it at their pleasure and in any lawful way that they see fit upon

no other consideration than by mutual consent." (citing *Dunaway v. Roden*, 71 So. 70 (Ala.

Ct. App. 1916))).  As a result, the court agrees that Echols's testimony raises a genuine issue

of fact as to whether the parties orally agreed to defer the commissions.  Conros's argument

that Echols lacks sufficient factual support for the alleged deferral is therefore without merit.


2.    <u>CONROS'S ARGUMENT THAT ECHOLS HAS NO LEGAL BASIS FOR THE
      1998 DEFERRAL AGREEMENT</u>

      Still, Conros argues that, aside from a lack of factual support, Echols also lacks an

adequate legal basis to validate the alleged oral agreement.  (Doc. 56 at 19-22.)  Specifically,

Conros maintains that, "even if there were any evidence of its existence, the alleged 1998

oral modification of the 1994 agreement would be invalidated by the Statute of Frauds

because the modification itself is not in writing."  (*Id.* at 21.)

In pertinent part, Alabama's Statute of Frauds provides that:

> In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
>
> > (1) Every agreement which, by its terms, is not to be performed within one year from the making thereof . . . .

Ala. Code § 8-9-2.  And, as correctly noted by Conros, (*see* Doc. 56 at 20), "'[t]he general rule is that a contract required by the statute of frauds to be in writing cannot be modified by subsequent oral agreement,'" *Kelmor, LLC*, 20 So. 3d at 793 (quoting *Cammorata v. Woodruff*, 445 So. 2d 867, 872 (Ala. 1983)).

Conros first points out that the 1994 Agreement falls within the Statute of Frauds, and as such required a writing.[18]  (Doc. 56 at 20.)  Consequently, Conros reasons that, under the general rule, any modifications to the 1994 Agreement required a writing as well.  (*Id.* at 20-21.)  So, noting that Echols has alleged only an oral agreement to support his claim that the parties agreed to defer the commissions, Conros argues that the alleged modification is void under the Statute of Frauds.  (*Id.* at 21.)  In response, Echols contends that "Conros' argument merely cites the 'general rule' with respect to contract modification within the statute of frauds," and insists that, in the instant case, an exception to the general rule applies. (*See* Doc. 61 at 20-21.)

Echols is correct that, notwithstanding the general rule in Alabama regarding oral modifications to written contracts that fall within the Statute of Frauds, "'the authorities are

---

[18] Echols has acknowledged the same.  (Doc. 61 at 20.)

divided as to whether a written contract falling within the statute of frauds may be orally modified as to time of performance,'" and "'it is generally agreed that if the oral modification is not just an extension of time, but goes to the substance of the contract, the modification is invalid.'" *Kelmor, LLC*, 20 So. 3d at 793 (quoting *Cammorata*, 445 So. 2d at 872) (stating that because contract specifically noted that time was of the essence, any modification to the time of performance would have been a material and substantive change, and therefore would need to satisfy the Statute of Frauds); *Roberson v. Faircloth*, 365 So. 2d 1224, 1226 (Ala. Civ. App. 1978) (noting that while the issue appeared to be moot, the alleged "oral extension of time for payment of a mortgage is not in violation of the Statute of Frauds," (citing *Land v. Cooper*, 34 So. 2d 313 (Ala. 1948); *Woolen v. Taylor*, 2 So. 2d 413 (Ala. 1941))); *see also Carter v. Haralson*, 362 So. 2d 242, 244 (Ala. Civ. App. 1978) ("An oral agreement may be presented to demonstrate that the written terms of an offer have been modified, waived or varied.  However, oral agreements to extend the time for performing previous agreements merely supplement, rather than change, such agreements' terms and obligations in other respects." (citing *Fed. Land Bank v. Bridgeforth*, 173 So. 66 (Ala. 1937); *Bell-Carnes Realty Co. v. Drennen*, 122 So. 424 (Ala. 1929); 17A Am. Jur. 2d *Contracts* § 471) (internal citations omitted).

Nevertheless, Conros advocates that "the alleged deferral made a material alteration to Echols' 1994 agreement, namely, how much he was to be compensated," reasoning that "Echols assumed [the commission payments] would be invested and presumably increase

over time," and, as a result, "Echols is equipped to demand over $1 million in interest as a result of the alleged deferral." (Doc. 56 at 21 (citing Doc. 30, Ex. 1 at 4).)[19]  For that reason, Conros maintains the alleged deferral goes to the substance of the 1994 Agreement, and is invalid under the Statute of Frauds.  (*Id.*)  By contrast, Echols notes that he "testified that he made no specific agreement regarding investing the money or keeping it in a separate account," and therefore submits "there was simply no other possible 'modification' other than the time the money was due." (Doc. 61 at 22.)  Indeed, Echols insists that "it is inconceivable that this 'modification[]' . . . actually *changed* any 'material element' of the contract," and, to that end, concludes that the Statute of Frauds is inapplicable to the deferral. (*Id.* at 22-23.)

Initially, the court finds unpersuasive Conros's argument that, given the amount of accumulated interest, which Conros points out is alleged to be over $1 million, that the alleged deferral constitutes a material change to the 1994 Agreement. (*See* Doc. 56 at 21.) Particularly, the court finds relevant section 8-8-8 of the Alabama Code, which provides that:

> All contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty bear interest from the day such money, or thing, estimating it at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed.

Ala. Code § 8-8-8.  In construing section 8-8-8, the Supreme Court of Alabama reiterated that "[it] has been interpreted to mean that 'in contract cases, where an amount is certain or

---

[19] Exhibit 1 to document number 30 represents the expert witness report of Certified Public Accountant James L. Hart, Echols's expert on damages.  (Doc. 30, Ex. 1 at 2.)

can be made certain as to damages at the time of breach, the amount may be increased by the addition of legal interest from that time until recovery,'" *Miller & Co., Inc. v. McCown*, 531 So. 2d 888, 889 (Ala. 1988) (quoting Charles W. Gamble, *Alabama Law of Damages* § 8-3 (2d ed. 1988)), clarifying that "'[a]ll liquidated demands for a sum certain, fixed by agreement or otherwise, bear interest from the time the party becomes liable and bound to pay them,'" *id.* (quoting Gamble, *supra*, § 8-7). *See also Cash v. Mayo*, 429 So. 2d 1092, 1094 (Ala. Civ. App. 1983) ("The interest to the prevailing party on a breach of contract case is awarded from the day the money should have been paid, most simply, from the day of the breach." (citing Ala. Code § 8-8-8; *Brown v. Robinson*, 354 So. 2d 272 (Ala. 1977))).

Simply put, if the parties agreed in October or November of 1998 that Conros would defer paying the commissions due under the 1994 Agreement until Echols retired from or left the company, which remains a question of fact, *see supra* Part III.B.1, then absent a fully integrated and inconsistent superseding agreement, Conros could not have breached the agreement until September of 2006, when Echols left Conros to join Jarden, (*see* Doc. 56 at 13; Doc. 57, Ex. A at 171, 187-88, Ex. B at 57-60). And, because no breach could occur until September of 2006, no interest could accrue prior to September of 2006. *See Miller & Co., Inc.*, 531 So. 2d at 889. As such, Conros's argument is without merit;[20] the court finds,

---

[20] Apparently, even Conros agrees in part. Indeed, in its Motion in Limine to Exclude Proposed Expert Opinion Testimony from James L. Hart, (Doc. 53), now moot, (*see* Doc. 59), Conros argued that Hart's conclusion that Conros owed over $1 million in prejudgment interest "[was] patently inconsistent with [Echols's] claim, [Echols's] testimony, and Alabama case law," (Doc. 53 at 14-15). Instead, citing to, *inter alia*, Alabama Code section 8-8-8, Conros suggested that prejudgment interest would not accrue until Echols left Conros, i.e. September of 2006. (*See id.*)

given Echols's testimony, (*see* Doc. 57, Ex. B at 177-78, 196-97), which the court must accept as true for purposes of summary judgment, *see Anderson*, 477 U.S. at 255, that the alleged deferral modified only the time to pay the 2% commissions.  So, because the alleged deferral modified only the time of Conros's performance, leaving the remainder of the 1994 Agreement unchanged, the court is of the opinion that it did not materially change the 1994 Agreement.  *See Kelmor, LLC*, 20 So. 3d at 793.  Accordingly, the court agrees that the general rule, which again requires modifications to written contracts that fall within the Statute of Frauds to themselves satisfy the statute, is inapplicable.

The court also agrees that "[t]he statute of frauds is wholly inapplicable to contracts such as Echols' where he has already fully preformed [sic]."  (Doc. 61 at 23.)  In Alabama, "[t]he statute of frauds requiring certain contracts to be in writing applies to executory and not to executed contracts."  *Scott v. S. Coach & Body Co., Inc.*, 197 So. 2d 775, 777 (Ala. 1967) (citing *Harris Transfer & Warehouse Co. v. Moor*, 65 So. 416, 417 (Ala. Ct. App. 1914) (holding statute did not apply to oral agreement requiring employer to pay sales commissions to former employee because former employee had already made the sales and therefore contract was fully executed); *see also Price v. Univ. of Ala.*, 318 F. Supp. 2d 1084, 1093 (N.D. Ala. 2003) ("'A contract is executed, and not voided by the Statute of Frauds, if the plaintiff has fully performed his obligation to the defendant and sues the defendant to obtain the defendant's performance or the completion of the defendant's performance.'" (quoting *Ramsay v. Clarke County Health Care Auth.*, 829 So. 2d 146, 155 (Ala. 2002))).

That said, Conros asserts that the Statute of Frauds applies to void the alleged deferral for an additional reason, positing that "the alleged oral modification itself violates the Statute of Frauds because it could not have been performed within one year." (Doc. 56 at 22.) Specifically, Conros claims that "[s]ince Echols' term of employment was for renewable three year periods, an agreement deferring his commissions until his retirement could not possibly be performed within one year." (*Id.*) Conros's argument is without merit.

Particularly, Conros's argument is without merit because, as aforementioned, the Statute of Frauds does not apply to executed agreements. *See supra* p. 27. In addition, the argument is also unavailing because, although Conros is correct that the 1994 Agreement provided an initial employment term of three years, the initial term ended on May 1, 1997.[21] (*See* Doc. 57, Ex. D at ¶¶ A, G.) Thereafter, Echols's employment at Conros continued, but the parties did not immediately enter into a subsequent employment contract. (*See id.*, Ex. B at 149, 194-95, 204.) Under these circumstances, the general rule is that continued performance results in the formation of a new, implied contract, which generally encompasses the same terms as the written agreement. *See Hughes Assocs., Inc. v. Printed Circuit Corp.*, 631 F. Supp. 851, 853 (N.D. Ala. 1986) ("The general rule is that where

---

[21] It is relevant to point out that while Conros states that the 1994 Agreement contemplated "renewable three year periods," (Doc. 56 at 22; Doc. 63 at 8 n.8), the plain language of the agreement indicates only that the initial three-year term was "to be mutually extended," without specifying a particular duration, (Doc. 57, Ex. D at ¶ A). And, though it cites to Echols's deposition transcript to bolster its interpretation, (*see* Doc. 56 at 21-22 (citing Doc. 57, Ex. A at 87-88)), a review of the transcript reveals that Echols was unsure as to the meaning of "to be mutually extended," and could not recollect whether the term called for three-year period extensions, (*see* Doc. 57, Ex. A at 88).

parties who have entered into a contract continue their respective performance thereunder beyond the expiration date of the contract, the parties are deemed to have mutually agreed to a new implied contract encompassing the same terms." (citing *Blalock v. Perfect Subscription Co.*, 458 F. Supp. 123, 126 (S.D. Ala. 1978))).

That said, as courts and commentators have recognized, "[i]f the original contract was for more than one year and the statute of frauds requires that contracts not performable within one year be in writing, continued employment after the original term expires may not give rise to an implied contract for a like period." 27 Am. Jur. 2d *Employment Relationship* § 30; *see also Northrop v. Kirby*, 454 F. Supp. 698, 701 (N.D. Ala. 1978) ("The law of contracts in Alabama is clear that a contract of employment for a definite period terminates by its own terms at the end of such period.  It is only when the employment continues for an indefinite period, after the expiration of the original employment, that the employment may be terminated at will by either party.") (internal quotation marks and citations omitted).  *See also, e.g.*, *Hines v. Ward Baking Co.*, 155 F.2d 257, 260 (7th Cir. 1946) ("[W]here the original term is for more than a year, a continuation in employment will not support a presumption of continuation for a renewal of the original term but, at the most, only of employment from year to year thereafter.") (citation omitted); *Borne Chemical Co., Inc. v. Dictrow*, 445 N.Y.2d 406, 411 (N.Y. App. Div. 1981) ("Where the original term of an employment contract is for more than one year, a continuance in employment will not, because of the Statute of Frauds, support a presumption of a renewal for the full period of

the original term, but only for employment for year to year thereafter.") (citations omitted);

*Gonzales v. United Sw. Nat'l Bank of Santa Fe*, 602 P.2d 619, 621 (N.M. 1979) ("Where a

written contract is for a period of more than one year, a renewal contract for a like period is

not enforceable without a writing." (citing 2A Arthur Linton Corbin, *Corbin on Contracts*

§ 504) (1st ed. 1950)).   So, while the court agrees that Echols's continued employment

resulted in the formation of a new, implied contract, generally encompassing the same terms

as the 1994 Agreement, it remains that, because of the Statute of Frauds, the implied contract

did not encompass the 1994 Agreement's initial three-year term.[22]   Instead, when the initial

---

[22] Additionally, the Supreme Court of Alabama has consistently held that, "[i]n Alabama, an employment relationship is ordinarily 'at will,' and the fundamental principle of employment at will is that the employment relationship is terminable by either party at any time and for any reason." *Eagle Prods., Inc. v. Glasscock*, 882 So. 2d 280, 289-90 (Ala. 2003) (citing *Ex Parte Michelin N. Am., Inc.*, 790 So. 2d 674, 677 (Ala. 2001)).   To rebut this presumption, three elements must be established:

> (1) that there was a clear and unequivocal offer of lifetime employment or employment of definite duration; (2) that the hiring agent had authority to bind the principal to a permanent employment contract; and (3) that the employee provided substantial consideration for the contract separate from the services to be rendered.

*Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987) (internal citations omitted); *see also Stutts v. Sears, Roebuck & Co.*, 855 F. Supp. 1574, 1584-85 (N.D. Ala. 1994) (holding that employee failed to rebut presumption under Alabama law that all employees are employees-at-will so as to demonstrate new contract was for definite term because, *inter alia*, "services to be rendered" in continued employment is insufficient consideration to rebut presumption, and employee had failed to offer other consideration, (quoting *Hoffman-La Roche*, 512 So. 2d at 728)).   Here, because Echols left his previous position in Birmingham, Alabama to join Conros, relocating approximately 1,000 miles to Toronto, Canada, (*see* Doc. 56 at 3-4; Doc. 57, Ex. B at 24-25, 86-89), the court finds that "substantial consideration for the contract separate from the services to be rendered" existed when the parties executed the 1994 Agreement, *see Hoffman-La Roche*, 512 So. 2d at 728.   However, this past consideration would no longer be applicable to the implied renewal of the 1994 Agreement, and Conros has not alleged other consideration to rebut the presumption.   (*See generally* Doc. 56 at 21-22.)   Accordingly, in addition to the aforementioned reasons for rejecting Conros's argument that

three-year term lapsed, Echols became an at-will employee, able to retire "at any time and for any reason."  *See Eagle Prods.*, 882 So. 2d 280, 289-90 (Ala. 2003) (citation omitted); *see supra* note 22.  As such, Conros's Statute of Frauds argument is unavailing.

Conros also asserts that because "the breach [of the 1994 Agreement] occurred *before* the supposed 1998 oral modification . . . the alleged deferral does not resurrect Echols' claim which had accrued as of 1996," (*see* Doc. 56 at 17), i.e. the year Conros first made sales to Walmart, *see supra* note 5.  The court disagrees.  Primarily, to interpret the authority previously cited regarding the validity of oral modifications that merely extend the time of performance, *see, e.g., Jeff D. Jordan & Co.*, 6 So. 2d at 474; *Carter*, 362 So. 2d at 244, to apply only where performance is not yet due, would be too narrow.  And, even if the court credited such an interpretation, it remains that "[a]n agreement to forbear from prosecuting a claim does normally constitute valid consideration."  *Roberts v. Pearce Const. Co., Inc.*, 624 So. 2d 1009, 1012 (Ala. 1993) (citing *Rogers v. First Nat'l Bank of Birmingham*, 211 So. 2d 796 (Ala. 1968)).  For the foregoing reasons, Conros's motion for judgment as a matter of law on the ground that Echols lacks sufficient legal support for his claim that the parties agreed to a deferral of his commission payments is due to be denied.

---

the parties' continued employment relationship resulted in the implied renewal of the 1994 Agreement for a second three-year term, the court finds that Alabama's presumption that all employees are employees-at-will provides an additional basis.

## C.   CONROS'S ARGUMENT THAT ECHOLS IMPLIEDLY WAIVED ANY RIGHT TO RECOVERY

Next, Conros advocates that "[a]ssuming *arguendo* that Echols' breach of contract claim is not barred by the Statute of Limitations, Echols has impliedly waived any right to recover unpaid commissions under the two-percent commission provision of the 1994 agreement." (Doc. 56 at 23.)  Conros reasons that Echols accepted over $650,000 in annual bonuses, never demanded payment of the sales commissions, and, in May of 1999, entered into the 1999 Agreement, which did not reference the commissions. (*Id.* at 23-24.)  Conros suggests that "[t]he only reasonable conclusion based on this record evidence is that Echols was perfectly content with bonuses and understood he was not owed any commissions," and that this conduct "amounts to an implied waiver." (*Id.* at 24.)  In response, Echols states that "[t]his argument deserves short shrift," insisting "there is no credible evidence of a waiver by Echols in this case." (Doc. 61 at 32.)  The court agrees.

As stated by the Supreme Court of Alabama:

> Waiver is the intentional relinquishment of a known right. *O'Neal v. O'Neal*, 284 Ala. 661, 663, 227 So. 2d 430, 431 (1969).  "[I]ntentional relinquishment must be shown in an unequivocal manner." *Putman Constr. & Realty Co. v. Byrd*, 632 So. 2d 961, 965 (Ala. 1992).  A party's intent to waive a right may be found from conduct that is inconsistent with the assertion of that right. *Givens v. General Motors Acceptance Corp.*, 56 Ala. App. 561, 324 So. 2d 277, 279 (1975).

*Edwards v. Allied Home Mortgage Capital Corp.*, 962 So. 2d 194, 208-09 (Ala. 2007).

What's more, "[w]hether a party has intentionally waived a known right is normally a jury question." *Id.* (citing *Putman Constr. & Realty*, 632 So. 2d at 965).

In the instant case, the court disagrees that Echols waived a right to commission payments simply because he accepted the annual bonuses.[23]  If the parties agreed to defer the commissions until Echols retired from or otherwise left Conros, then, absent a subsequent agreement, Echols could not have demanded that Conros pay the commissions until after he left Conros for Jarden, in September of 2006.[24]  (*See* Doc. 56 at 13; Doc. 57, Ex. A at 171, 187-88, Ex. B at 57-60).  And, while Echols could not recall exactly when he first demanded payment following his departure, (*see* Doc. 57, Ex. B at 332-33), the parties agree that Echols requested that Conros pay the commissions by at least August 6, 2007, (Doc. 56 at 14; Doc. 57, Ex. L), although Echols contends that, by that time, he had already spent "many, many months and attempts of trying to get [Navin] to settle up with [him]," (*see* Doc. 56, Ex. B at 332-36, Ex. K, Ex. L).  Thereafter, or as Conros suggests, "only months" later, (Doc. 56 at 24), Echols filed suit, (*see* Doc. 1).  Simply put, drawing all reasonable inferences in favor of Echols, the court finds that Echols's conduct does not demonstrate an "intentional relinquishment of a known right" to the commission payments, *see Edwards*, 962 So. 2d at 208 (citing *O'Neal*, 227 So. 2d at 431), "'shown in an unequivocal manner,'" *see id.* (quoting

---

[23] And, again, as stated above, the annual bonus payments do not specify that they are in lieu of, or in addition to, Conros's obligation to pay commissions.  *See supra* note 14.  A reasonable jury could find such payments were intended by the parties to be in lieu of commissions or in addition to the commissions.

[24] Actually, Conros would not be obligated to pay the commissions until thirty days after Echols left the company for Jarden.  *See* Ala. Code § 8-24-2 (c) ("All commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within thirty days after the date of termination.").

*Putman Constr. & Realty*, 632 So. 2d at 965.  For that reason, Conros's argument that Echols

waived his right to recover the payments is unavailing.


**D.    CONROS'S ARGUMENT THAT THE 1999 AGREEMENT CONSTITUTES
       A VALID CONTRACT AS A MATTER OF LAW**

Lastly, Conros submits that "there is no genuine issue of material fact, and judgment

as a matter of law is due to be entered resolving the dispute about the validity of the 1999

agreement."   (Doc. 56 at 27.)   Specifically, Conros asserts that the 1999 Agreement

completely supersedes the 1994 Agreement, thereby entitling Conros to judgment as a matter

of law.  (*See id.* at 10-12.)  By contrast, Echols advances alternative positions regarding the

validity of the 1999 Agreement, arguing primarily that it constitutes a "legal nullity."  (Doc.

47 at ¶ 1001; Doc. 61 at 37-38.)  On the other hand, Echols suggests that "if the [the 1999

Agreement] has any legal effect whatsoever, . . . it is a mere modification of [the 1994

Agreement]," and "is incapable of nullifying Echols 2% sales commission."[25]  (Doc. 61 at

---

[25] Despite Conros's repeated objections to Echols's alternative positions, (*see* Doc. 56 at 25-
27; Doc. 63 at 9-10), the court agrees that Echols's strategy is permissible under the Federal Rules
of Civil Procedure.  First, as Echols correctly points out, (*see* Doc. 61 at 38), Rule 8(d)(3) expressly
provides that "[a] party may state as many separate claims or defenses as it has, regardless of
consistency," Fed. R. Civ. P. 8(d)(3).  Second, the authority cited by Conros, *Jim Walter Homes, Inc.
v. Saxon*, 880 So. 2d 428, 433 (Ala. 2003) (stating that "'a party may not 'pick and choose which
contract provisions [he] wishes to have benefit [him] and reject those [he] does not wish to have bind
[him]; instead [he] must accept or reject the entire contract'" (quoting *Credit Sales, Inc. v. Crimm*,
815 So. 2d 540, 546 (Ala. 2001))), is distinguishable.  In that case, the Supreme Court of Alabama
merely recognized the inconsistency of the plaintiff homeowner's attempt to recover damages
through breach of contract, while simultaneously avoid enforcement of the arbitration agreement
attached to the contract, expressly incorporated by reference.  *Id.* at 429-30, 432-33.  In the instant

38-39.)  For purposes of summary judgment, the court agrees.

Initially, although somewhat cryptic, the court agrees that the 1999 Agreement constitutes a valid contract.  (*See* Doc. 57 at Ex. I.)  Under Alabama law, "[t]he elements of a contract are an agreement, consideration, two or more contracting parties, a legal object, and capacity."  *Curacare, Inc. v. Pollack*, 501 So. 2d 470, 471 (Ala. Civ. App. 1986) (citing *Freeman v. First State Bank of Albertville*, 401 So. 2d 11 (Ala. 1981)).  And, "[i]t is well settled that whether parties have entered a contract is determined by reference to the reasonable meaning of the parties' external and objective actions.  Conduct of one party from which the other may reasonably draw an inference of assent is effective as acceptance."  *SGB Const. Servs., Inc. v. Ray Sumlin Const. Co., Inc.*, 644 So. 2d 892, 895 (Ala. 1994) (citing *Deeco, Inc. v. 3-M Co.*, 435 So. 2d 1260 (Ala. 1983)).  However, "'[a]ssent [is] . . . [o]rdinarily manifested by a *signature*.'"  *Baptist Health Sys., Inc. v. Mack*, 860 So. 2d 1265, 1273 (Ala. 2003) (quoting *S. Energy Homes, Inc. v. Hennis*, 776 So. 2d 105, 108 (Ala.

---

case, the parties executed the 1999 Agreement over five years after the 1994 Agreement, the 1999 Agreement does not reference the 1994 Agreement, and, at any rate, Echols has made clear that "[he] has neither pled nor made a claim for 'breach' of this May, 1999 document." (Doc. 61 at 37.)  And, while Conros takes issue with Echols's deposition testimony, in which Echols conveyed that he was "suing on breach of both [the 1994 and 1999 Agreements]," (Doc. 57, Ex. B at 17), it remains well settled that "the client entrusts the attorney with the fiduciary duty of making certain strategic and tactical decisions about the case, decisions for which the client is accountable even when made without express authorization or approval," *Jacobs v. Elec. Data Sys. Corp.*, 240 F.R.D. 595, 601 (M.D. Ala. 2007) ("Decisions to concede certain parts of a case in order to focus on others, or not to pursue every possible claim cognizable under the law, are examples of strategic or tactical choices well within the scope of the attorney's authority, decisions that bind the client." (citing *Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002))).

2000)).  Additionally, while it is also well settled that "'[an offer] cannot be accepted to form a contract unless the terms of the contract are reasonably certain . . . [t]he terms of a contract are reasonably certain if they provide a basis for *determining the existence of a breach and for giving an appropriate remedy*.'"  *White Sands Group, L.L.C. v. PRS II, LLC*, 998 So. 2d 1042, 1051 (Ala. 2003) (quoting 17A Am. Jur. 2d *Contracts* § 183).

In the instant case, the 1999 Agreement is signed and dated by both Navin and Echols. (Doc. 57, Ex. I at 1.)  Further, the court finds that those terms included therein are reasonably certain, with the parties' subsequent conduct corresponding accordingly.  (*See id.* at 1-2, Ex. A at 159-60, 195-96, Ex. B at 255, Ex. G at 7-11.)  For example, the 1999 Agreement purported to increase Echols's salary from $150,000 to $200,000.  (*Id.*, Ex. I at 1.)  Conros subsequently paid, and Echols accepted, a $200,000 salary.  (*Id.*, Ex. A at 195-96, Ex. B at 255.)  Also, the 1999 Agreement specified that Conros would pay Echols up to $50,000 per year in bonuses for the following five years.  (*See id.*, Ex. I at 1.)  Echols's bonuses for 1999, 2000, 2001, 2002, and 2003 each amounted to $50,000.  (*Id.*, Ex. G at 7-11.)

Still, and notwithstanding its validity, for purposes of summary judgment, the court nonetheless disagrees that the 1999 Agreement completely supersedes the 1994 Agreement, thereby discharging Conros's obligation to pay the 2% commissions.  Indeed, it is true that, "[w]hen parties execute successive agreements and the 'two agreements cover the same subject matter and include inconsistent terms, the later agreement supersedes the earlier agreement.'"  *Cavalier Mfg., Inc. v. Clarke*, 862 So. 2d 634, 641 (Ala. 2003) (quoting *CMI*

36

*Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002)).  Yet, "'[i]t is a general rule that a party claiming that a contract modifies a prior contract must show that the later contract is definite and certain as to the terms of modification, and the modification extends only so far as the terms are definite, certain and intentional.'"  *McLemore v. Hyundai Motor Mfg. Ala. LLC*, 7 So. 3d 318, 333 (Ala. 2008) (quoting *Johnson-Rast & Hays, Inc. v. Cole*, 310 So. 2d 885, 889 (Ala. 1975)).

Here, the 1999 Agreement does not mention Conros's obligation to pay the 2% commissions,[26] does not reference the 1994 Agreement, and does not include an integration clause.[27]  (*See* Doc. 57 at Ex. I.)  In fact, the 1999 Agreement expressly states: "Details to be finalized," indicating that the parties had not included all of Echols's terms of employment within the agreement.  (*Id.*, Ex. I at 2.)  So, for these reasons, and considering that Navin, not

---

[26] Although the 1999 Agreement does provide Echols with an incentive-based bonus structure calculated according to Conros's total sales for each year, a reasonable jury could find that the provision in this agreement does not supersede the 2% commission obligation.  (*See* Doc. 57, Ex. I at 1.)  Indeed, the 1999 Agreement specifies that the purpose of the bonus structure is "to cover up [Echols's] loss of $225,000 he took when he sold his business in Alabama."  (*Id.*)  Conros does not dispute the purpose of the incentive-based bonus structure; rather, Navin testified that the 1999 Agreement's $50,000 increase in salary eliminated the 1994 Agreement's commission obligation.  (*See id.*, Ex. A at 196-98.)  However, Echols has offered conflicting testimony.  (*Id.*, Ex. B at 16-18, 20-21.)

[27] The court recognizes that "'it is not always necessary for a later contract to contain an integration clause in order for this later contract to supersede an earlier contract.'"  *Cavalier Mfg.*, 862 So. 2d at 641 (quoting *Archambo v. Lawyers Title Ins. Corp.*, 646 N.W.2d 170, 177 n.16 (Mich. Ct. App. 2002)).

Echols, drafted the 1999 Agreement,[28] the court finds that the agreement is only partially integrated, and, as such, Echols's testimony is admissible to show that it did not discharge Conros's obligation to pay the 2% commissions. *See Prince*, 935 So. 2d at 445 ("'A 'partial integration' is a written instrument which has not been adopted by the parties as a complete and exclusive statement of the terms of the agreement.  Parol evidence of consistent additional terms may supplement an otherwise incomplete document.'" (quoting 29A Am. Jur. 2d *Evidence* § 1116)).  Therefore, given Echols's testimony, the court is of the opinion that a factual issue exists with respect to whether the parties intended the 1999 Agreement to discharge Conros's obligation to pay the 2% commissions, a question properly reserved for the jury.  As a result, the court finds Conros's argument that the 1999 Agreement completely supercedes the 1994 Agreement as a matter of law to be unpersuasive.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that Conros's Motion in Limine to Exclude Proposed Expert Opinion Testimony from James L. Hart, (Doc. 53), will be denied as moot, and its Motion for Summary Judgment, (Doc. 55), will be denied.  Echols's Motion to Extend the Page Limit for Summary Judgment Response Memorandum, (Doc. 60),

---

[28] "'[I]f all other rules of contract construction fail to resolve the ambiguity, then, under the rule of contra proferentem, any ambiguity must be construed against the drafter of the contract.'" *Cavalier Mfg.*, 862 So. 2d at 642 (quoting *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000)).  The 1999 Agreement makes clear that it was "written by Navin Chandaria." (Doc. 57, Ex. I at 1.)

38

will be granted.  An Order in conformity with this Memorandum Opinion will be entered

contemporaneously.

**DONE** this 27th day of July, 2010.


SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE